1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   GREGORY JOSEPH WOODS,                     No.  2:11-cv-03168-KJN P

12                  Petitioner,

13         v.                                  ORDER AND

14   MARION SPEARMAN,[1]                       FINDINGS AND RECOMMENDATIONS

15                  Respondent.

16

17         Petitioner is a state prisoner, proceeding through counsel, with a petition for writ of

18   habeas pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2007 conviction for robbery (Cal.

19   Penal Code 211) with a firearm personal use enhancement (Cal. Penal Code § 12022.53(b)),

20   evading an officer (Cal. Vehicle Coe § 2800.2(a)), and use of tear gas (Cal. Penal Code §

21   12403.7(g)).  Petitioner is serving a sentence of thirteen years.

22         Petitioner raises the following claims:  (1) trial counsel had a conflict of interest; and (2)

23   ineffective assistance of counsel.  After careful consideration of the record, the undersigned

24   recommends that the petition be denied.

25   ─────────────────
     [1] Petitioner named Gary Swarthout as respondent.  (ECF Nos. 1, 17.)  The court substitutes the
26   correct respondent, the Warden of California State Prison, Solano, where petitioner is currently
     incarcerated.  See Stanley v. Cal. Supreme Court, 21 F.3d 359, 360 (9th Cir. 1994) (citing Rule
27   2(a), Rules Governing Habeas Corpus Cases Under § 2254) ("A petitioner for habeas corpus
     relief must name the state officer having custody of him or her as the respondent to the
28   petition."); see also Smith v. Idaho, 392 F.3d 350, 355-56 (9th Cir. 2004).

# BACKGROUND FACTS

The opinion of the California Court of Appeal contains a factual summary.  After independently reviewing the record, the court finds this summary to be accurate and adopts it herein:

> Shelley M. worked as a cashier at a gas station in Yreka. About 9:00 p.m. on September 24, 2005, Shelley's daughter entered the gas station, spoke with defendant who was in the store, and introduced him to Shelley. Defendant seemed to be unimpaired and bought some chewing tobacco. There was a lot of money in Shelley's cash drawer at the time.
>
> About 9:40 p.m., Shelley's coworker Lanette L. arrived at the gas station and noticed from the front door about $5,000 in cash on a desk in the office. Lanette went inside and told Shelley to put the money away, which she did.
>
> Later that night, Lanette saw defendant's pickup truck at a gas pump although no one got out of the truck. Five minutes later, the truck went behind the station and then towards the high school. The truck had been parked across the street the previous evening but left when a police car entered the station.
>
> Ten to 20 minutes later, defendant entered the station and announced to Lanette, "This is a holdup. Give me your money." Lanette thought defendant was joking and pulled his mask off. Defendant repeated his demand. Lanette then tried to grab his gun, a .25 caliber automatic that was pointed at her head but she was unable to reach it. Lanette yelled to Shelley. Seeing defendant holding a gun in one hand and Lanette in his other hand, Shelley dialed 911 and informed the operator that defendant had a gun. Defendant approached Shelley and, pointing the gun at Lanette, told Lanette to get behind the counter and to get the money. Lanette retrieved about $114 from the cash register, and put the money in a black, blue and gray bag as instructed while defendant repeatedly said "it's too late." He did not smell of alcohol, did not fumble with the gun, did not shake, and seemed to be steady on his feet. Defendant asked, "Where's the rest of the money?" He approached Lanette, ordered her to the floor at gunpoint, and said, "It's over ." Lanette begged him not to kill her. Defendant reached into the bag, pulled out pepper spray, and sprayed Lanette, demanding to know where the rest of the money was. Lanette directed defendant to the office. Defendant came out of the office and again demanded to know the location of the money. Lanette explained that Shelley had probably put the money "in the drop." Defendant returned to Lanette, made her lift up her face, and pepper sprayed her face. Defendant's pupils were "huge," like somebody on drugs or nervous or filled with adrenalin. Defendant then left the station. Shelley went over to Lanette and thought she had been shot because of the red pepper spray.
>
> Shortly after 11:00 p.m., Yreka Police Officer Scott Daugherty arrived at the gas station on a report of a robbery by a male suspect with a small handgun and saw

2

defendant leaving with a bag. After looking in some parked cars, defendant walked through a field with a depression and blackberry bushes. The officer lost sight of defendant. Siskiyou County Deputy Sheriff Robert Stewart searched the field, heard a rustling sound, and found defendant carrying a bag. Defendant walked away from the officer even though ordered several times to stop.

Defendant got into a pickup truck and led officers on a three-and-one-half-mile pursuit though residential neighborhoods, traveling over 65 miles per hour, failing to stop at stop signs, and turning the lights off on his truck. One officer got into an accident with a third car while pursuing defendant, causing damage to the patrol car and injuring the occupants in the other car. The chase ended when defendant crashed his truck into another car. Defendant got out of his truck and was arrested. He displayed no signs of drug or alcohol intoxication, his pupils were not dilated or constricted, and he did not smell of alcohol. Officers opined that defendant's driving skills during the pursuit were contrary to someone under the influence. A search of the truck revealed a blue and gray backpack with duct tape on it. In the backpack, officers discovered a headlamp, pepper spray, loose currency, and plant material from the blackberry bushes in the field. A total of $215 in cash and 40 cans of chewing tobacco taken from the gas station were recovered from defendant. An empty prescription bottle for hydrocodone was found in the truck. Defendant denied taking any medications and said the bottle was an old one.

Defendant admitted that he alone had robbed the gas station, using pepper spray. He denied the use of a gun. He told an officer at the scene that it was a "long story" as to why he had robbed the station. A few hours after the robbery, a corrections officer at jail did not see any signs that defendant was intoxicated. No gun was recovered from the field. Defendant had owned a .25 caliber handgun at one time.

Anthony M. testified for the defense. Anthony had been defendant's neighbor for over a year. About 3:30 p.m. on the day of the robbery, Anthony saw defendant and thought defendant's behavior was unusual. About 9:30 p.m. that night, Anthony had to go to defendant's home because defendant's dogs were barking. Defendant was not home. Anthony stayed until 11:00 p.m. and then left. Anthony's wife stayed at defendant's home and defendant never came home that night.

Defendant testified. He admitted having owned a .25 caliber handgun but claimed he lost it on a backpacking trip in August 2005. He admitted that he did not report having lost it.

Defendant taught at the high school in Yreka. He coached the week before the robbery. On Wednesday before the robbery, he was introduced to Shelley at the gas station. At a powder-puff football game later that night, his back went out and he sought medical care from nurse practitioner Karen E. On Thursday, Karen gave him a prescription for 90 "soma" and 600–milligram ibuprofen. Later that day, he got gas for his truck at the station. The next day, a Friday, defendant drove to Redding for a PET scan. A questionnaire that he filled out that day reflected

that he claimed no recent injuries. He got some valium from a nurse prior to the scan. He then returned to Yreka and had his back x-rayed.

On the day of the robbery, Saturday, September 24, defendant sought additional care for his back and received a prescription for Norco from Karen. He filled the prescription and was upset that it was a "small size of Norco." He wanted to complain to Karen but the medical facility was closed. He went to a friend's home and was angry. He did not recall taking any prescription medications when he got home.

Defendant admitted that he had a gambling problem and was behind on his rent and truck payment. He denied asking Jeff A. for a $2,000 loan. He admitted that Jeff gave him $200 when defendant claimed $800 had been stolen from him. He denied stealing Jeff's identity to get a loan. Defendant claimed that Jeff gave his social security number to defendant. Defendant denied asking Sandy S. for a loan. Defendant denied using his estranged spouse's name to obtain a loan. He denied forging a prescription for Norco and taking it to a pharmacy.

Defendant claimed he did not remember much about the robbery. He did not remember packing a backpack with gloves, pepper spray and a headlamp; painting his face black; dressing all in black; or walking into the station. He admitted the pepper spray belonged to him. He had had it for two years and used it while backpacking. He had no recollection of having a gun and denied that he did. He had a "quick flashback" of the lights and the coolers inside the station and had a "moment of clarity" when fleeing from the police. He was awakened when he crashed. He did not remember the booking process or the officer's questions about medications. He did not remember being interviewed. He was released from jail the next day and went home. He thought that he had taken 12 Soma, two or three Valium, all of the Norco, and drank some wine coolers based on what he found on the counter. He admitted, however, that he was not sure what he took. Five days after the robbery, defendant spoke with a psychiatrist and gave details of the robbery, which he claimed he had read in the police report, having received the report from his attorney.

The psychiatrist, Dr. Thomas Andrews, testified that defendant claimed to have been depressed for a year. Defendant explained the robbery in detail as well as having been taken to jail and having been asked about the medications he had taken. Defendant claimed a doctor had prescribed him Norco, Soma, and Valium, all depressants. If taken together, Dr. Andrews opined that the person would be disoriented, possibly psychotic, and unable to make decisions. Dr. Andrews watched the videotape of defendant's booking and admitted that defendant did not exhibit any symptoms of having taken depressants. He appeared sober.

Defendant's friend, Steven V., went backpacking with defendant in August 2005. During the trip, defendant stated that he had lost his gun. Steven looked for the gun on his way back from the trip. Steven never told law enforcement that defendant had lost his gun.

In rebuttal, Shelley testified and confirmed that her daughter introduced her to defendant on the day of the robbery.

Sandy S. loaned $2,000 to defendant prior to the robbery. On cross-examination, Sandy stated that she noticed several empty pill bottles in defendant's home the day after the robbery.

Jeff gave $200 to defendant although he had asked for $2,000. Defendant often asked for a loan in September. Jeff did not give his social security number to defendant in order for him to obtain a loan.

The prosecutor's office did not give the police report to defendant's attorney until October 11, 2005, more than two weeks after the robbery. The police department did not have any record of providing a copy of the report to defendant.

On July 2, 2004, Dennis C., the pharmacist at a Rite Aid pharmacy, determined that the ostensible prescribing physician, Dr. Sternberg, had not written the prescription for Norco and that it was forged. Dennis identified defendant as having dropped off the prescription. The parties stipulated that if called to testify, Dr. Sternberg would confirm that the prescription was forged.

In surrebuttal, defendant claimed he got a copy of the police report from the police department on September 27. Defendant explained that Dr. Sternberg was one of his treating physicians and when he needed a new prescription, he would either go into the office and get the prescription or called Dr. Sternberg who called it into the pharmacy. Defendant denied being the one who had forged the prescription in July 2004. Defendant claimed that he had been through chemotherapy and did not appear the same during that period of time, which conflicted with Dennis's testimony. Defendant claimed that he had had other people pick up prescriptions for him and bring them to him where he was camping because he could not drive.

People v. Woods, 2010 WL 1805382, at *1-4 (Cal. Ct. App. May 6, 2010).

**PROCEDURAL BACKGROUND**

Petitioner's trial in Siskiyou County Superior Court began on November 13, 2007. (Respondent's Lodged Document ("LD") 4 at 212, see ECF. No. 25.)  The jury returned its guilty verdict on November 16, 2007.  (LD 7 at 827.)  Petitioner received a sentence of three years imprisonment for robbery and a ten-year consecutive sentence for the gun use enhancement.  (Id. at 1028.)  On May 6, 2010, the California Court of Appeal for the Third Appellate District affirmed petitioner's conviction.  Woods, 2010 WL 1805382, at *1.  On September 1, 2010, the California Supreme Court denied his petition for review.  (LD 13.).

On November 30, 2011, petitioner filed a petition for writ of habeas corpus and a motion to stay in this court.  (ECF Nos. 1, 2.)  The court granted petitioner's motion to stay on February 29, 2012.  (ECF No. 10.)

On March 27, 2012, petitioner filed a petition for writ of habeas corpus in Siskiyou County Superior Court.  (LD 14.)  The Superior Court denied the petition on May 16, 2012. (ECF No. 17-5 at 11 ("Exhibit P").)  On June 22, 2012, petitioner filed a petition for writ of habeas corpus in the California Court of Appeal.  (LD 15.)  The Court of Appeal denied the petition without a reasoned decision on November 8, 2012.  (LD 17.).

On December 21, 2012, petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  (LD 18.)  The petition differed from the prior petitions in that it incorporated a declaration from petitioner's trial counsel, Joseph Gazzigli.  (Id. at Exhibit O.) The California Supreme Court denied the petition without a reasoned decision on March 13, 2013.  (LD 19.)

On April 15, 2013, petitioner filed a second amended petition for writ of habeas corpus in this court.  (ECF No. 17.)  Respondent filed an answer on August 7, 2013.  (ECF No. 24.) Petitioner filed a traverse on November 4, 2013.  (ECF No. 28.)

## APPLICATION OF 28 U.S.C. § 2254(d)

### I.  Legal Standards

Section 2254 confers upon a federal district court the jurisdiction to consider a petition for writ of habeas corpus challenging a state court conviction.  A writ of habeas corpus is available under § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.

Where a state court resolves a federal constitutional claim on the merits, the petitioner in federal court may not succeed on that claim absent a showing that the state court's resolution of the claim was contrary to law or unreasonable.  § 2254(d).  Congress adopted this standard when

6

it revised the habeas statutes in 1996 as part of the Anti-terrorism and Effective Death Penalty Act (the "AEDPA").  To meet this standard, a petitioner must establish that the state court's adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d).

Section 2254(d) is a gateway; if a petitioner satisfies either subsection (1) or (2) for a claim, then the federal court considers that claim de novo.  See Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (When § 2254(d) is satisfied, "[a] federal court must then resolve the claim without the deference AEDPA otherwise requires."); Frantz v. Hazey, 533 F.3d 724, 737 (9th Cir. 2008).

In 2011, the Supreme Court clarified the § 2254(d) standards.  First, the Court made clear that, when making the determination that a state court decision was contrary to law or unreasonable, a federal court may not consider evidence which was not available to the state court.  Cullen v. Pinholster, ___ U.S. ____, 131 S. Ct. 1388, 1398-1401 (2011).  Second, the Court stressed the deferential nature of the § 2254(d) standards:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Harrington v. Richter, ___ U.S. ____, 131 S. Ct. 770, 786-87 (2011).

Thus, federal habeas relief is precluded if " 'fairminded jurists could disagree' on the correctness of the state court's decision."  Id. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  This objective standard of reasonableness applies to review under both subsections of § 2254(d).  See Hibbler v. Benedetti, 693 F.3d 1140, 1146-47 (9th Cir. 2012).  The federal court must engage in this deferential review even where the state court has not provided a

1   reasoned decision.  <u>Richter</u>, 131 S. Ct. at 784-85.

2          In the present case, most of petitioner's claims were raised and rejected in the Court of

3   Appeal's reasoned decision on direct appeal.  However, he raised some new claims in his state

4   habeas petition, which was summarily denied.  A summary denial is presumed to be a denial on

5   the merits.  <u>Stancle v. Clay</u>, 692 F.3d 948, 957 n.3 (9th Cir. 2012) (the presumption that the denial

6   is based on the merits, rather than on procedural grounds, may be overcome if it is not

7   "plausible").  While the federal court cannot analyze just what the state court did when it issued a

8   summary denial, the federal court must review the state court record to determine whether there

9   was any "reasonable basis for the state court to deny relief."  <u>Richter</u>, 131 S. Ct. at 784.  The

10  federal court "must determine what arguments or theories . . . could have supported[ ] the state

11  court's decision; and then it must ask whether it is possible fairminded jurists could disagree that

12  those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

13  Court."  <u>Id.</u> at 786.  The petitioner bears "the burden to demonstrate that 'there was no reasonable

14  basis for the state court to deny relief.'"  <u>Walker v. Martel</u>, 709 F.3d 925, 939 (9th Cir. 2013)

15  (quoting <u>Richter</u>, 131 S. Ct. at 784).

16         When reviewing the California Supreme Court's summary denial of a petition, this court

17  must consider that

18         the California Supreme Court's summary denial of a habeas petition on the merits
19         reflects that court's determination that "the claims made in th[e] petition do not
           state a prima facie case entitling the petitioner to relief."  It appears that the court
20         generally assumes the allegations in the petition to be true, but does not accept
           wholly conclusory allegations, and will also "review the record of the trial . . . to
21         assess the merits of the petitioner's claims."

22  <u>Pinholster</u>, 131 S. Ct. at 402 n.12 (quoting <u>In re Clark</u>, 5 Cal.4th 750, 770 (1993), and citing

23  <u>People v. Duvall</u>, 9 Cal.4th 464, 474 (1995)).

24         Accordingly, if this court finds petitioner has unarguably presented a prima facie case for

25  relief on a claim, the state court's summary rejection of that claim would be unreasonable.  <u>Taylor</u>

26  <u>v. Maddox</u>, 366 F.3d 992, 1000 (9th Cir. 2004); <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1054-55 (9th

27  Cir. 2003).

28

Under § 2254(d)(1), a state court decision is "contrary to . . . clearly established Federal law" if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). A state court decision is an "unreasonable application" of clearly established federal law if "the state court correctly identifies the governing legal principle . . . but unreasonably applies it to the facts of the particular case." Bell v. Cone, 535 U.S. 685, 694 (2002) (citing Williams v. Taylor, 529 U.S. 362, 407-08 (2000)). "Clearly established Federal law" is found in the United States Supreme Court's "applicable holdings." Carey v. Musladin, 549 U.S. 70, 74 (2006). It refers to "'holdings, as opposed to the dicta, of [the Supreme Court's] decisions' at the time the state court decides the matter." Cannedy v. Adams, 706 F.3d 1148, 1157 (9th Cir. 2013) (quoting Stanley v. Schriro, 598 F.3d 612, 617 (9th Cir. 2010)), amended by 733 F.3d 794 (9th Cir. 2013). "[C]ircuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, ___U.S. ____, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, ___ U.S. ____, 132 S. Ct. 2148, 2155 (2012)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Id. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey, 549 U.S. at 77.

There are two ways a petitioner may satisfy § 2254(d)(2). Hibbler, 693 F.3d at 1146. He may show the state court's findings of fact "were not supported by substantial evidence in the state court record" or he may "challenge the fact-finding process itself on the ground it was deficient in some material way." Id. (citing Taylor, 366 F.3d at 999-1001). If a petitioner overcomes one of the hurdles posed by § 2254(d), this court may review the merits of the claim de novo. See Frantz, 533 F.3d at 737.

9

Addressed below is the application of § 2254(d) to each claim in the petition.  This court finds that none of petitioner's claims survives § 2254(d) review.

**II.  Petitioner's Conflict of Interest Claim**

Petitioner argues that trial counsel, Joseph Gazzigli, had a conflict of interest because he previously represented an adverse witness in a medical malpractice case.  For the reasons described below, this court finds that petitioner's conflict of interest claim does not satisfy the requirements of § 2254(d) and therefore recommends denial of that claim.

**A.  Background**

The Court of Appeal set out the background for this claim as follows:

Defendant contends that trial counsel had a conflict of interest that adversely affected his defense and that the trial court failed to investigate defendant's allegations of a conflict of interest in his motion for new trial. We reject these claims.

Defendant was convicted in November 2007 and sentencing was scheduled for December 2007. Prior to sentencing, the prosecutor filed a statement in aggravation, and Attorney Gazzigli filed a request that the court strike the gun enhancement and impose the lower term for the robbery offense. On the date scheduled for sentencing, defendant personally filed a motion for a new trial, alleging ineffective assistance of counsel, newly discovered evidence, and evidence tampering. The prosecutor opposed the motions, arguing that defendant's motion for a new trial did not include his declaration but instead his sister's declaration. Defendant's new trial motion was denied. After an in camera hearing, the court granted defendant's Marsden (People v. Marsden (1970) 2 Cal.3d 118) motion, relieved Attorney Gazzigli, and appointed new counsel, Attorney John Lawrence.

At sentencing on April 11, 2008, the court denied defendant's Marsden motion to relieve Attorney Lawrence but granted defendant's motion to represent himself. In representing himself, defendant sought a new trial and read part of his declaration. The court interrupted, noting that defendant's claims would more appropriately be decided in a writ of habeas corpus. Defendant commented that he needed legal representation. The court inquired whether defendant desired the reappointment of Attorney Lawrence and defendant responded affirmatively and withdrew his request to represent himself. Attorney Lawrence was reappointed.

After Attorney Lawrence's request for a continuance was denied, Attorney Lawrence made an oral motion for a new trial, submitted "two sets of documents," defense exhibits A and B, and noted that the prosecutor had not seen them. The prosecutor objected to the lack of notice, commenting that one set of documents was an inch thick and the other was defendant's declaration which was

10

1   not signed. The court allowed defendant to swear under penalty of perjury that the
2   declaration was his.

3   Defendant's exhibit B consisted of the following: a lengthy document labeled
    points and authorities with mostly "points," and defendant's declaration, a portion
4   of which defendant had previously read to the court.

5   Defendant's exhibit A consisted of the following: defendant's personally prepared
    motion for a new trial, claiming ineffective assistance of Attorney Gazzigli, which
6   consisted of a 52-page, single-spaced, "introduction/background" and numerous
7   attachments, totaling almost 100 pages.

8   In the 52–page introduction/background, defendant discussed Attorney Gazzigli's
    failure to object to Dennis's rebuttal testimony wherein he stated that he filled a
9   prescription for defendant which had a forged signature of Dr. Sternberg, and
    Attorney Gazzigli's stipulation that if called to testify, Dr. Sternberg would state
10  that the prescription had been forged. Defendant states: "The trial court cannot
11  ignore a letter sent to defendant [o]n May 9, 2007, where Gazzigli announces the
    possibility of a[n] 'Alleged Forgery' brought into evidence would be a (conflict of
12  interest) for Mr. Gazzigli, due to the fact Dr. Sternberg had been a client at one
    time. (see Exhibit X) The fact that Dr. Sternberg's name is used prominently
13  throughout testimony by Dennis frustrates the defendant, as the doctor was never
14  called to testify. This is unacceptable, and defendant cannot justify or envision a
    viable strategy."
15
    The exhibit (exhibit X) is a letter dated May 9, 2007, from Attorney Gazzigli to
16  defendant which stated in relevant part, that additional discovery was enclosed,
    including "an allegation that [defendant] attempted to forge Dr. Sternberg's name
17  on a Norco prescription." Attorney Gazzigli stated, "I am not certain if the DA
    will attempt to put this into evidence but if they do, I have a potential conflict, as
18  Dr. Sternberg was a previous client of mine. Therefore, I will discuss the same
19  with the DA and see where they are going with this."

20  During a 45-minute recess, the court reviewed defense exhibits A and B and
    thereafter denied the motion for a new trial. The court did not inquire about
21  Attorney Gazzigli's letter notifying defendant of a potential conflict of interest.

22

23  Woods, 2010 WL 1805382, at *4-6.

24                          **B.  Legal Standards**

25      It is well established that the Sixth Amendment right to effective assistance of counsel

26  carries with it "a correlative right to representation that is free from conflicts of interest."  Wood

27  v. Georgia, 450 U.S. 261, 271 (1981).  Conflicts of interest broadly embrace all situations in

28

                                        11

1    which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his

2    responsibilities to another client or a third person or by his own interests.  See generally ABA,

3    Model Rules Prof. Conduct, Rule 1.7 and Commentary (1983).  Conflicts may occur in various

4    factual settings.  For example, conflicts may arise in circumstances in which one attorney

5    represents more than one defendant in the same proceeding.  See, e.g., Holloway v. Arkansas, 435

6    U.S. 475, 481-91 (1978).  Conflicts may also arise in situations in which an attorney has

7    represented a person who is a witness, has a financial interest in the outcome of the case, or has a

8    personal relationship with the prosecutor.  See, e.g., Houston v. Schomig, 533 F.3d 1076, 1081

9    (9th Cir. 2008); United States v. Hearst, 638 F.2d 1190, 1193 (9th Cir. 1980).  The rule

10   prohibiting counsel from representing conflicting interests serves to protect confidential

11   information obtained during the course of an earlier representation, ensure undivided attorney

12   loyalty, and/or guard against infringement of the right to cross-examination.  See Sanders v.

13   Ratelle, 21 F.3d 1446, 1452-53 (9th Cir. 1994); Fitzpatrick v. McCormick, 869 F.2d 1247, 1251

14   (9th Cir. 1989); United States v. Allen, 831 F.2d 1487, 1497 (9th Cir. 1987); Trone v. Smith, 621

15   F.2d 994, 999 (9th Cir. 1980).  Courts "generally presume that the lawyer is fully conscious of the

16   overarching duty of complete loyalty to his or her client."  Burger v. Kemp, 483 U.S. 776, 784

17   (1987).

18         Generally, courts apply the Strickland standard to ineffective assistance of counsel claims,

19   and a petitioner must therefore prove that his attorney acted unreasonably and that those actions

20   or inactions prejudiced him.  Strickland v. Washington, 466 U.S. at 687, 694 (1984).  However,

21   the Supreme Court has carved out an exception to the requirement that a petitioner prove

22   prejudice for certain claims of attorney conflict of interest:  where a petitioner's attorney "actively

23   represented conflicting interests," the petitioner must show that "an actual conflict of interest"

24   existed and that it "adversely affected his lawyer's performance."  Cuyler v. Sullivan, 446 U.S.

25   335, 348 (1980).  In Sullivan, the Court examined multiple concurrent representations and

26   stressed the "high probability of prejudice arising" from this conflict situation and the difficulty

27   of proving prejudice.  Mickens v. Taylor, 535 U.S. 162, 175 (2002) (citing Sullivan, 446 U.S. at

28   348-49).  A petitioner who shows an "adverse affect" as a result of this conflict need not also

1   show he was prejudiced under Strickland.  Sullivan, 446 U.S. at 349-50.

2          Many courts of appeals have applied the Sullivan prejudice standard to a variety of

3   conflicts of interest.  See Mickens, 535 U.S. at 174-75 (collecting cases).  In Mickens, the

4   Supreme Court noted that this "expansive application" of the Sullivan prejudice standard was not

5   supported by the language of Sullivan.  Id. at 175.  The Court in Mickens explained that whether

6   or not the Sullivan prejudice standard should apply to conflict situations other than those

7   involving multiple concurrent representation was an "open question."  Id. at 176; see also

8   Schomig, 533 F.3d at 1081 ("Supreme Court . . . has left open the question whether conflicts in

9   successive representation that affect an attorney's performance require a showing of prejudice for

10  reversal."); Alberni v. McDaniel, 458 F.3d 860, 873 (9th Cir. 2006) (same); Earp v. Ornoski, 431

11  F.3d 1158, 1184 (9th Cir. 2005) (same); but see Lewis v. Mayle, 391 F.3d 989 (9th Cir. 2004)

12  (court applies Sullivan prejudice standard to conflict based on successive representation; no

13  discussion of, or citation to, Mickens).[2]  The Court stated that Sullivan does not "clearly establish,

14  or indeed even support" application of the Sullivan prejudice standard to these other situations.

15  Mickens, 535 U.S. at 176.  If Sullivan does not apply, a petitioner must meet the Strickland

16  prejudice standard by establishing a reasonable probability that, but for the conflict, the result of

17  the proceedings would have been different.  See id.; Strickland, 466 U.S. at 694.

18         A defendant may "waive his right to the assistance of an attorney unhindered by a conflict

19  of interests."  Holloway, 435 U.S. at 483 n.5.  "A valid waiver of conflict of interest must be

20  voluntary, knowing, and intelligent, such that the defendant is sufficiently informed of the

21  consequences of his choice."  Lewis, 391 F.3d at 996.  See also Garcia v. Bunnell, 33 F.3d 1193,

22

23  [2] Petitioner argues that this court should not rely upon the "open question" statement in Mickens
    because it is dicta.  (ECF No. 28 at 6.)  As discussed in the text, the Ninth Circuit has relied upon
24  this language and upon the Court's statement that Sullivan does not "clearly establish" application
    of its prejudice rule to any situation besides concurrent multiple representation.  In Earp v.
25  Ornoski, the Ninth Circuit stated:  "The Mickens Court specifically and explicitly concluded that
    Sullivan was limited to joint representation, and that any extension of Sullivan outside of the joint
26  representation context remained, 'as far as the jurisprudence of [the Supreme Court was]
    concerned, an open question.' " 431 F.3d 1158, 1184 (9th Cir. 2005) (quoting Mickens, 533 U.S.
27  at 176).  Whether or not it is technically dicta, this court must follow the lead of the Ninth Circuit
    in adhering to the Supreme Court's statements.
28

1   1195 (9th Cir. 1994) ("Even if counsel is subject to an actual conflict of interest, however, the

2   trial court may generally allow the attorney to proceed if the defendant makes a voluntary,

3   knowing, and intelligent waiver."); Allen, 831 F.2d at 1494 ("Of course, a defendant may waive

4   his right to the assistance of an attorney who is unhindered by conflicts . . . provided the waiver is

5   given knowingly and intelligently.").  Whether there is a proper waiver is to be determined by the

6   trial court and any such waiver should appear on the record.  Johnson v. Zerbst, 304 U.S. 458,

7   464-65 (1938).  Resolution of the issue of waiver depends "upon the particular facts and

8   circumstances surrounding that case, including the background, experience, and conduct of the

9   accused."  Id.; see also Edwards v. Arizona, 451 U.S. 477, 482 (1981).  Moreover, a court must

10   "indulge every reasonable presumption against the waiver of fundamental rights."  Lewis, 391

11   F.3d at 997 (citations omitted.)

12                              **C.  State Court Decision**

13        Petitioner raised his conflict of interest claim on direct appeal and again in his state habeas

14   petition.  The Court of Appeal issued a reasoned denial of the claim on direct appeal.  That denial

15   is set out below.  Neither the Court of Appeal nor the California Supreme Court explained its

16   denial of the claim when denying petitioner's habeas corpus petition.  The habeas claim appears

17   to be substantially similar to the appellate claim.  However, petitioner did present the California

18   Supreme Court with one piece of extra-record evidence in support of his habeas petition:

19   Gazzigli's declaration.  (See LD 18, Exhibit O.)

20        Gazzigli's declaration adds little, if anything, of substance to petitioner's conflict of

21   interest claim.  Because the claim on appeal was essentially the same as the claim in the state

22   habeas petition, the Court of Appeal's decision on appeal is the "last reasoned state court

23   decision" and therefore the decision subject to analysis under § 2254(d).  See Ylst v.

24   Nunnemaker, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment

25   rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same

26   claim [are presumed to] rest upon the same ground.").

27        But whether this court reviews the Court of Appeal's decision on direct appeal or the

28   California Supreme Court's summary denial of the habeas petition, the result is the same.

Petitioner has not shown the state court decisions were contrary to or an unreasonable application of federal law, or that they rested on an unreasonable determination of the facts.  The relevant portion of the Court of Appeal's opinion on appeal is set out below:

> A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. This constitutional right includes the correlative right to representation free from any conflict of interest that undermines counsel's loyalty to his or her client. [Citations.] "It has long been held that under both Constitutions, a defendant is deprived of his or her constitutional right to the assistance of counsel in certain circumstances when, despite the physical presence of a defense attorney at trial, that attorney labored under a conflict of interest that compromised his or her loyalty to the defendant." [Citation.] "As a general proposition, such conflicts "embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or his own interests. [Citation.]" (People v. Doolin (2009) 45 Cal.4th 390, 417 (Doolin).) Of course, "[t]he right to conflict-free counsel may be waived." (People v. Easley (1988) 46 Cal.3d 712, 729, disapproved on another point in Doolin, supra, 45 Cal.4th at p. 421, fn. 22.)

> Here, it may be argued that defendant accepted the risk of conflict. After defendant was informed of the potential conflict, defendant insisted on Attorney Gazzigli's representation when he moved to withdraw as counsel. Defendant never objected so the trial court did not know of a potential conflict and was thus not obligated to inquire. (Cuyler v. Sullivan (1980) 446 U.S. 335, 346-347.) On this record, it is unclear what more, if anything, defendant was told about the potential conflict and whether he expressly waived it. In any event, defendant's claim must be rejected.

> All of this came up after the trial and before sentencing. Thus the trial court was aware of Dr. Sternberg's role in the trial proceedings.

> Defendant contends that Attorney Gazzigli had a conflict of interest because he had previously represented Dr. Sternberg. Dennis testified the prescription for Norco had the forged signature of Dr. Sternberg and the parties stipulated that if called, Dr. Sternberg would testify that the prescription was forged. Defendant argues that Attorney Gazzigli's conflict had an adverse effect on his defense to the forged prescription allegation. Defendant complains that Attorney Gazzigli simply chose to question Dennis about defendant's appearance when he allegedly picked up the prescription and to recall defendant to deny his involvement.

> Applying the federal standard set forth in Mickens v. Taylor (2002) 535 U.S. 162, we conclude that defendant has failed to show that Attorney Gazzigli labored under ""an actual conflict of interest"" ""that affected counsel's performance—as opposed to a mere theoretical division of loyalties."" (Id. at p. 171]; see also Doolin, supra, 45 Cal.4th at pp. 417, 421.) To be candid, on this record, we do not

see even a theoretical division of loyalties.

"'An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.' [Citation.]" (Doolin, supra, 45 Cal.4th at p. 418, citing Mickens, supra, 535 U.S. at p. 172, fn. 5.) "[W]hether counsel's performance was 'adversely affected' under the federal standard 'requires an inquiry into whether counsel "pulled his punches," i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict. [Citation.] In undertaking such an inquiry, we are ... bound by the record. But where a conflict of interest causes an attorney not to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.' [Citation.]" (Doolin, supra, 45 Cal.4th at p. 418.)

Defendant suggests that Attorney Gazzigli pulled his punches by failing to object to Dennis's hearsay testimony that he learned in a telephone conversation with Dr. Sternberg's office that the prescription was forged and by failing to vigorously cross-examine Dennis about filling the prescription first before checking on whether it was genuine and whether he reported having done so. Had Attorney Gazzigli cross-examined Dennis accordingly, defendant argues Dr. Sternberg would have been called as a witness and Attorney Gazzigli would have had to cross-examine a former client. On cross-examination, defendant argues a nonconflicted attorney would have asked Dr. Sternberg the following:

"a. Whether [Dennis] actually called Dr. Sternberg's office on July 2, 2004, to inquire about a possible forged prescription.

"b. If [Dennis] didn't call Dr. Sternberg's office on July 2, 2004, how that office first found out about that particular prescription.

"c. Whether [defendant] had been a patient of Dr. Sternberg's.

"d. If so, whether Dr. Sternberg had issued legitimate prescriptions to [defendant] for Norco, how many such prescriptions, and when.

"e. Whether Dr. Sternberg would have filled a prescription for Norco on July 2, 2004, if [defendant] had requested it.

"f. Whether Dr. Sternberg had had a problem with prescriptions being forged in his patients' names.

"g. Whether there had been an investigation into allegations that office staff had been involved in forging prescriptions in his patients' names."

Defendant argues the foregoing cross-examination would have breached Attorney Gazzigli's duty of loyalty to Dr. Sternberg because it would have suggested Dr.

Sternberg mismanaged his office and his prescriptions, leading to possible discipline or criminal liability. Defendant speculates that Dr. Sternberg did not receive a call from Dennis which would have destroyed Dennis's credibility. Defendant complains that counsel also failed to investigate whether the handwriting on the prescription matched defendant's. Citing his statements in his personally prepared new trial motion, defendant alleges that Dr. Sternberg's office was being investigated for forged prescriptions by staff members. Defendant complains that counsel failed to call witnesses to confirm that defendant was camping out and had lost his hair.

Under the circumstances and on the record presented, defendant has failed to demonstrate a conflict of interest. Attorney Gazzigli stated in his letter that he had previously represented Dr. Sternberg. The parties stipulated that if called, Dr. Sternberg would testify the prescription was forged. Dr. Sternberg did not identify defendant as the forger. Defendant testified and denied that he forged the prescription. Defendant described his appearance which conflicted with Dennis's description of the person who dropped off the forged prescription. This evidence supports the inference that Attorney Gazzigli opted not to further cross-examine Dennis and not to call Dr. Sternberg because counsel determined the testimony would not assist the defense. Defendant's legal rights were not jeopardized. The record suggests that Attorney Gazzigli did not pull his punches but instead made a tactical decision on how best to proceed. There is a reasonable explanation for counsel's failure to call witnesses to confirm defendant's appearance—there were none. Defendant's suggested cross-examination of Dr. Sternberg is based on his unsubstantiated claim that Attorney Gazzigli failed to investigate whether the doctor could provide favorable evidence.

Even assuming defendant demonstrated the asserted conflict of interest adversely affected counsel's performance, defendant has failed to demonstrate a reasonable probability that he would have obtained a more favorable result in the absence of counsel's failures. (Doolin, supra, 45 Cal.4th at pp. 418, 428-430; Mickens, supra, 535 U.S. at p. 166.) Where an attorney "'actively represented conflicting interests'"  (multiple concurrent representation), a presumption of prejudice applies; Strickland v. Washington (1984) 466 U.S. 668, 692 (Strickland) "provides the appropriate analytic framework for assessing prejudice arising from attorney conflicts of interest outside the context of multiple concurrent representation." (Doolin, supra, 45 Cal.4th at p. 428; see also id. at p. 418.) The Strickland standard applies here.

The evidence against defendant was overwhelming. He admitted that he committed the offenses. The issues revolved around his use of a firearm and his mental state. Both victims claimed defendant had a weapon. He denied that he did. Defendant claimed he lacked the mental state to commit the crimes because he had used prescription medications and drank alcohol. Dr. Andrews reviewed the booking videotape and concluded defendant was sober, confirming the officers' testimony. Defendant's credibility was attacked in various ways, only

one of which involved the alleged forged prescription. When arrested, defendant denied taking any medications. He claimed otherwise at trial. Defendant claimed he related the details of the robbery to Dr. Andrews not based on his memory but based on a police report. Evidence was introduced that defendant could not have received a copy of the police report until after his meeting with Dr. Andrews. Defendant improperly used the social security number of one friend as well as his estranged spouse's name to get a loan/money although defendant denied their claims. Further, he committed a crime of moral turpitude, having admitted that he committed the robbery. Defendant's conflict of interest claim fails.

Woods, 2010 WL 1805382, at *6-8.

### D. Discussion

Petitioner challenges the state court determinations that: (1) Gazzigli did not have a conflict of interest that adversely affected his performance; (2) petitioner arguably waived the alleged conflict; and (3) the trial court did not have a duty to investigate the alleged conflict. Petitioner fails to demonstrate that these determinations were contrary to, or an unreasonable application of, clearly established federal law, or that they were based on an unreasonable determination of the facts.

### 1. A conflict of interest adversely affecting counsel's performance

#### a. Background

The Court of Appeal explained the role of Dr. Sternberg in petitioner's conviction: a Rite Aid pharmacist testified that petitioner dropped off a prescription bearing Dr. Sternberg's forged signature, and the parties stipulated that, if called, Dr. Sternberg would testify that he did not sign that prescription. Woods, 2010 WL 1805382, at *4, 8. In just one of "various ways" that the prosecutor attacked petitioner's credibility, the prosecutor suggested to the jury that petitioner forged and presented the prescription. Id. at *8.

Petitioner contends that Gazzigli had a conflict of interest because Gazzigli successfully represented Dr. Sternberg in a medical malpractice case in 1988—nearly twenty years before petitioner's criminal trial. (ECF No. 17 at 32, 37.) Petitioner believes that, given the "sensitive nature of a medical malpractice case, . . . it is virtually certain [Gazzigli] . . . acquired information about Dr. Sternberg which if raised during cross-examination would have been damaging to Dr.

18

1    Sternberg's credibility." (<u>Id.</u> at 32.)  According to petitioner, Gazzigli resolved this conflict by

2    stipulating to Dr. Sternberg's testimony.  (<u>Id.</u>)

3                                            **b. Analysis**

4           In <u>Mickens</u>, the Supreme Court explained that "'an actual conflict of interest mean[s]

5    precisely a conflict that affected counsel's performance—as opposed to a mere theoretical

6    division of loyalties." <u>Mickens</u>, 535 U.S. at 171.  Here, the Court of Appeal explicitly stated that

7    it was "applying the federal standard set forth in <u>Mickens</u>," and explained that it "d[id] not see

8    even a theoretical division of loyalties." <u>Woods</u>, 2010 WL 1805382, at *6.  The Court of Appeal

9    reasoned that the evidence "supports the inference that Attorney Gazzigli opted not to further

10   cross-examine [the pharmacist] and not to call Dr. Sternberg because counsel determined the

11   testimony would not assist the defense." <u>Id.</u> at 8.  In the opinion of the Court of Appeal,

12   "Gazzigli did not pull his punches but instead made a tactical decision on how best to proceed."

13   <u>Id.</u>  Gazzigli's declaration, which petitioner submitted with his habeas petition to the California

14   Supreme Court and this court, does not undermine the Court of Appeal's analysis.  (<u>See</u> ECF No.

15   17-5 at 7 ("Gazzigli Decl.").)  Petitioner has failed to establish that the state court's determination

16   that Gazzigli did not have an actual conflict of interest amounts to a transgression of federal law,

17   particularly when Gazzigli's representation of Dr. Sternberg in an unrelated medical malpractice

18   case preceded petitioner's criminal trial by nearly twenty years.

19          With respect to the issue of prejudice, the Court of Appeal noted that a presumption of

20   prejudice applies in cases of multiple concurrent representation, but applied the <u>Strickland</u>

21   standard and found no prejudice in light of the "overwhelming" evidence against petitioner.

22   <u>Woods</u>, 2010 WL 1805382, at *8. Petitioner's emphasis on <u>Sullivan</u> and his claim that the Court

23   of Appeal should have applied the presumption of prejudice is misguided, as the Court of

24   Appeal's finding that petitioner did not establish a conflict of interest mooted the issue of

25   prejudice.  Because petitioner had not established the foundational element of a conflict of

26   interest claim (i.e., an actual conflict of interest), the Court of Appeal could have ended its

27   analysis of the claim upon finding that Gazzigli did not labor under a conflict of interest.  <u>See</u>

28   <u>Sullivan</u>, 446 U.S. 349 ("[U]ntil a defendant shows that his counsel actively represented

                                                 19

1   conflicting interests, he has not established the constitutional predicate for his claim of ineffective

2   assistance.").

3        Furthermore, petitioner has not established any error in the Court of Appeal's

4   determination that—if there were an actual conflict of interest—petitioner would have had to

5   show prejudice.  As explained in <u>Mickens</u>, the Supreme Court has not decided whether the

6   presumption of prejudice applies in any context other than multiple concurrent representation.

7   <u>Mickens</u>, 535 U.S. at 171.  The present case does not involve multiple concurrent representation,

8   as Gazzigli represented Dr. Sternberg in a medical malpractice case nearly two decades before

9   representing petitioner.  <u>See Rowland v. Chappell</u>, 902 F. Supp. 2d 1296, 1319 (N.D. Cal. 2012)

10  ("Petitioner can cite to no Supreme Court cases finding an actual conflict of interest where, as

11  here, defense counsel previously represented a state witness in a civil matter completely unrelated

12  to the criminal matter.").  The Court of Appeal's conclusion that petitioner failed to establish

13  prejudice in light of the "overwhelming" evidence of his guilt does not warrant habeas relief.

14       Thus, petitioner has not established that the state court's conclusion that Gazzigli did not

15  labor under a conflict of interest that adversely affected his performance was contrary to, or an

16  unreasonable application of, clearly established federal law, or that such a finding was based on

17  an unreasonable application of the facts.

18                          **2. Waiver**

19       The Court of Appeal opined that "it may be argued that defendant accepted the risk of

20  conflict."  <u>Woods</u>, 2010 WL 1805382, at *6.  Petitioner challenges this suggestion and

21  emphasizes that he was "never asked to waive the conflict of interest, either in writing or

22  verbally, and never in fact waived such potential or actual conflict."  (ECF No. 17 at 38-39.)

23       Petitioner fails to appreciate that the Court of Appeal merely speculated, and did not

24  actually reach a conclusion, on the issue of waiver.  <u>Woods</u>, 2010 WL 1805382 at *6 ("On this

25  record, it is unclear what more, if anything, defendant was told about the potential conflict and

26  whether he expressly waived it.  In any event, defendant's claim must be rejected.").  The Court

27  of Appeal did not make a determination on the issue of waiver because it found that there was no

28  conflict of interest for petitioner to waive.  Stated otherwise:  finding that there was no conflict of

1  interest mooted the issue of waiver.   The Court of Appeal's dicta does not warrant habeas relief.

2  ### 3.  Trial court's duty to inquire

3  The Court of Appeal concluded that the trial court was "not obligated to inquire" into the

4  purported conflict of interest.[3]  Id.  Citing Holloway, petitioner contends that once a trial court

5  becomes aware of a potential or actual conflict, it has a duty to inquire into the conflict.  (ECF

6  No. 17 at 39.)  Petitioner argues that it was error therefore for the trial court to make no attempt to

7  inquire into the conflict, which the court became aware of "when petitioner filed his motion for

8  new trial and brought trial counsel's letter admitting the conflict to the court's attention."  (Id. at

9  40.)

10  But the Supreme Court has elaborated on—and considerably narrowed—the duty of trial

11  courts to inquire into conflicts of interest since Holloway.  See United States v. Lafuente, 436

12  F.3d 894, 897 (7th Cir. 2005) ("Subsequent Supreme Court decisions have limited the Holloway

13  holding to situations in which the district court requires joint representation over a timely

14  objection.").  Of particular relevance is the Supreme Court's statement in Sullivan that a trial

15  court need only initiate inquiry if "the trial court knows or reasonably should know that a

16  particular conflict exists."  446 U.S. at 347.

17  The fact that there was no actual conflict of interest is fatal to petitioner's argument.

18  Because there was no conflict of interest, there was nothing for the trial court to inquire about.

19  Again, Sullivan quite clearly imposes the duty to inquire only "when the trial court knows or

20  reasonably should know that a particular conflict exists."  Id.  Accordingly, petitioner has not

21  demonstrated that the trial court had a duty to investigate the purported conflict of interest.  The

22  state court's rejection of petitioner's argument was not contrary to or an unreasonable application

23  of clearly established federal law or based on an unreasonable determination of the facts.

24  ### 4.  Conclusion on petitioner's conflict of interest claim

25  Petitioner has not demonstrated that the state court's rejection of his conflict of interest

26

27  [3] The Court of Appeal explained:  "After defendant was informed of the potential conflict, defendant insisted on Attorney Gazzigli's representation when he moved to withdraw as counsel. Defendant never objected so the trial court did not know of a potential conflict and was thus not

28  obligated to inquire."  Woods, 2010 WL 1805382 at *6 (citing Sullivan, 446 U.S. at 346-47).

1   claim was so lacking in justification that there was an error well understood and comprehended in

2   existing law beyond any possibility for fairminded disagreement.  See Richter, 131 S. Ct. at 786-

3   87.  Accordingly, a writ of habeas corpus on that claim is not available under § 2254.

4       **III.  Petitioner's Ineffective Assistance of Counsel Claims**

5       Petitioner contends that Gazzigli's performance was constitutionally inadequate because

6   Gazzigli (1) failed to investigate and call several witnesses, (2) failed to introduce into evidence

7   petitioner's backpack, (3) failed to subpoena a witness after promising to present her testimony to

8   the jury in his opening statement, (4) failed to request a jury instruction on involuntary

9   intoxication, (5) conceded petitioner's use of pepper spray, and (6) rendered a cumulatively

10  deficient performance.  For the reasons set out below, this court finds petitioner has failed to

11  satisfy § 2254(d) for any of these assertions of ineffective assistance of counsel.  This court

12  therefore recommends denial of petitioner's claim of ineffective assistance of counsel.

13      **A.  Legal Standards**

14      The Sixth Amendment standard for analyzing an ineffective assistance of counsel claim is

15  well established.  First, a petitioner must show that counsel's conduct failed to meet an objective

16  standard of reasonableness.  Strickland, 466 U.S. at 687.  There is "a 'strong presumption' that

17  counsel's representation was within the 'wide range' of reasonable professional assistance."

18  Richter, 131 S. Ct. at 787 (quoting Strickland, 466 U.S. at 689).  When determining whether the

19  state court's application of the Strickland standard was reasonable, the federal court must be

20  "doubly" deferential.  Id. at 788.  The "standard for judging counsel's representation is a most

21  deferential one" and the reasonableness standards of § 2254(d) are also "highly deferential."  Id.

22  Further, because the Strickland rule is a "general" one, courts have "more leeway . . . in reaching

23  outcomes in case-by-case determinations" and the "range of reasonable applications is

24  substantial."  Id. at 786; Premo v. Moore, ___ U.S. ____, 131 S. Ct. 733, 740 (2011).  As the

25  Court explained in Richter: "When § 2254(d) applies, the question is not whether counsel's

26  actions were reasonable.  The question is whether there is any reasonable argument that counsel

27  satisfied Strickland's deferential standard."  131 S. Ct. at 788.

28  ////

1    The second part of the <u>Strickland</u> test requires a petitioner to show that counsel's conduct

2 prejudiced him.  <u>Id.</u> at 691-92.  Prejudice is found where "there is a reasonable probability that,

3 but for counsel's unprofessional errors, the result of the proceeding would have been different."

4 <u>Id.</u> at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the

5 outcome."  <u>Id.</u>  "The likelihood of a different result must be substantial, not just conceivable."

6 <u>Richter</u>, 131 S. Ct. at 792 (citing <u>Strickland</u>, 466 U.S. at 693).

7     **B.  Evidence Presented**

8    The Court of Appeal summarized the evidence presented:

9
10   The evidence against defendant was overwhelming.  He admitted that he
   committed the offenses.  The issues revolved around his use of a firearm and his
   mental state.  Both victims claimed defendant had a weapon.  He denied that he
11   did.  Defendant claimed he lacked the mental state to commit the crimes because
   he had used prescription medications and drank alcohol.  Dr. Andrews reviewed
12   the booking videotape and concluded defendant was sober, confirming the
   officers' testimony.  Defendant's credibility was attacked in various ways, only
13   one of which involved the alleged forged prescription.  When arrested, defendant
   denied taking any medications.  He claimed otherwise at trial.  Defendant claimed
14   he related the details of the robbery to Dr. Andrews not based on his memory but
   based on a police report.  Evidence was introduced that defendant could not have
15   received a copy of the police report until after his meeting with Dr. Andrews.
   Defendant improperly used the social security number of one friend as well as his
16   estranged spouse's name to get a loan/money although defendant denied their
   claims.  Further, he committed a crime of moral turpitude, having admitted that he
17   committed the robbery.

18

19 <u>Woods</u>, 2010 WL 1805382, at *8.

20     **C.  Petitioner's Inadequacy of Counsel Claims**

21      **1.  Failure to investigate and call witnesses**

22    Petitioner contends that "a competent defense attorney would have given disproving the

23 gun enhancement top priority," complains that Gazzigli relied "upon the prior public defender's

24 very limited investigation and the district attorney['s] investigation," and sets out the evidence he

25 argues a reasonable attorney would have found and presented.[4]   Specifically, he contends that

26

27 [4] While this court uses the term "evidence" to refer to petitioner's factual support for his claims,
  the undersigned recognizes that the factual support is not evidence at this point.  Rather, it is
28 petitioner's proffer in support of his claims.

1 Gazzigli should have interviewed and called Sierra Black, Patricia Moore, Roben Printy, and

2 Norma Knickerbocker—each of whom petitioner alleges was available to testify—because their

3 testimony would have established that immediately after the robbery neither of the victims stated

4 that petitioner had used a gun.

5      Petitioner raised this issue in his direct appeal.  The Court of Appeal found the record was

6 "insufficient to evaluate a claim of ineffective assistance of counsel," at least with respect to the

7 allegation that Gazzigli was deficient in not calling Black and Printy.  Petitioner's habeas

8 petitions included declarations from Black and Printy.  A declaration from private investigator Ilir

9 Nushi described his post-conviction conversations with Moore and Knickerbocker.

10      Petitioner argues that the witnesses described above would have established that neither

11 victims Linderman nor Moikeha, immediately after the robbery, stated that petitioner had used a

12 gun in the robbery, and that both only mentioned pepper spray.  Petitioner contends that

13 Linderman and Moiheka fabricated the story that petitioner had a gun because they were upset

14 that petitioner had sprayed Linderman with pepper spray.  In support of this alleged motive,

15 petitioner cites Exhibit G attached to the amended petition, which is one page of the report

16 prepared by defense investigator Bowlin of her interview with Black dated December 16, 2005.

17 (ECF No. 17-2 at 7.)  This report states that Black told Bowlin that Moikeha "really want[ed]

18 [petitioner] to go down for this."  (Id.)  The portion of the report submitted by petitioner does not

19 suggest that either Linderman or Moikeha were motivated to fabricate based on petitioner's use of

20 pepper spray.

21      **a. Analysis**

22      *Black*

23      Petitioner contends that Gazzigli's performance was constitutionally inadequate because

24 Gazzigli "failed to pursue an investigation" of Black.  (ECF No. 17 at 40.)

25      As noted above, attached to the amended petition is one page of a report by defense

26 investigator Bowlin of her interview with Black.  (ECF No. 17-2 at 7.)  In the page attached to the

27 amended petition, Bowen reports that Black stated that robbery victim Shelly Moikeha is a

28 substance abuser and, on the night or the robbery, asked her daughter to bring her a bag of

24

1    marijuana.  (Id.)  After Black and Moikeha's daughter delivered the marijuana to Moikeha at the

2    gas station, Black and Moikeha's daughter left.  (Id.)  A short time later, Moikeha called her

3    daughter and told her that there had been a robbery.  (Id.)  Black and Moikeha's daughter returned

4    to the gas station.  (Id.)

5           When Black returned to the gas station after the robbery, Moikeha told her that she was in

6    the back when petitioner came in and robbed the place, so she called the police.  (Id.)  Black said

7    that Moikeha said that the other victim, Linderman, told Moikeha that petitioner had held a gun to

8    Linderman's head, Linderman said, "please don't kill me," and petitioner responded, "It's too late

9    for that."  (Id.)  Black told investigator Bowlin that Moikeha stated that she did not hear these

10   statements herself or see a gun.  (Id.)  Moikeha told Black that she assumed that petitioner had a

11   gun but it might have been the pepper spray.  (Id.)

12          Petitioner alleges that prosecution investigator Golden also interviewed Black.  Petitioner

13   alleges that the prosecutor provided this report to the defense.  Petitioner claims that in this

14   interview with Golden, Black denied delivering marijuana to Moikeha and claimed that

15   investigator Bowlin lied in her report about the marijuana.  Attached to petitioner's amended

16   petition is a portion of Golden's report of this interview.  (ECF No. 17-3 at 58.)  In this statement,

17   Black states that she was interviewed by defense investigator Bowlin.  (Id.)  Black said that the

18   statement in Bowlin's report that Black said that Moikeha used drugs was a lie.  (Id.)  In the

19   petition, citing the Golden report, i.e., exhibit M, petitioner argues that Golden's report also states

20   that Moikeha did not say she saw a gun during the robbery when speaking to Black.  (ECF No.

21   17 at 42.)  The undersigned has reviewed petitioner's exhibit M and finds no mention by Golden

22   of any statement made to her by Black regarding a gun.

23          In a post-conviction declaration, Black clarified that her statements to Bowlin were the

24   truth.  In this declaration, signed September 28, 2010, Black states that on the night of the

25   robbery, she and Moikeha's daughter delivered marijuana to Moikeha at the gas station.  (ECF

26   No. 17 at 55.)  Black states that when she returned to the gas station after the robbery, Moikeha

27   did not mention seeing a gun, hearing any comments by either the robber or Linderman about a

28   gun, or any mention of the robber having a gun.  (Id. at 56.)  Black states that her statement to

1   defense investigator Bowlin is accurate except she does not remember Moikeha telling her about

2   any statements made by Linderman during the robbery.  (Id.)

3        The Bowlin report states that Black stated that Moikeha told her that she did not see a gun

4   during the robbery.  Petitioner claims that Black told Golden the same thing. The Bowlin report

5   also states that on the night of the robbery, Moikeha told Black that Lindeman told Moikeha that

6   petitioner had a gun.  In her post-conviction declaration, Black now states that she does not

7   remember Moikeha making this statement.  The portion of the Golden report in the instant record

8   does not address whether Moikeha discussed with Black statements made by Linderman to Black

9   regarding whether petitioner had a gun.

10        Because Black gave conflicting statements to the defense and prosecution investigators,

11   Gazzigli may have made a tactical decision not to call her as a witness.  In any event, for the

12   reasons stated herein, the undersigned finds that petitioner was not prejudiced by Gazzigli's

13   failure to call Black as a witness.

14        Testimony by Black that Moikeha, on the night of the robbery, told her that Moikeha did

15   not see a gun would have undermined Moikeha's trial testimony that she saw a gun.  However,

16   there was other, sufficient evidence that petitioner had a gun on the night of the robbery and that

17   the victims did not later fabricate petitioner's use of the gun.  In her testimony regarding the 911

18   tape played to the jury, Moikeha testified that she referred to the "man with the gun" during the

19   911 call:

20           Q:  Did – during the dispatch tape, did you hear the dispatcher talk
              about the male half and female half, and you referred to a woman
21           helping –

22           A:  Yeah.

23           Q:  --the man with the gun?  When you said somebody was helping
              the man with the gun, who were you referring to?
24
             A:  It was Lanette.
25

26   (RT at 305-06.)

27        While Moikeha may have been confused regarding whether she actually saw petitioner

28   with the gun, the 911 tape, played to the jury and discussed at trial, in which Moikeha referred to

26

1   the "man with the gun," demonstrated that she and Linderman did not later fabricate a story

2   regarding petitioner using a gun.  In addition, were she called to testify, Black could have testified

3   that on the night of the robbery Moikeha told her that Linderman told Moikeha that petitioner had

4   a gun.

5           Moreover, Linderman's testimony regarding petitioner's use of the gun was clear.  (RT at

6   249, 251, and 257 (Linderman testifying that she tried to grab petitioner's gun, that petitioner

7   pointed the gun at her head, and that petitioner had the gun in his hand until his demeanor

8   changed and "he went and got the pepper spray.")

9           For these reasons, the undersigned finds that the reasons discussed above, the undersigned

10  finds that petitioner has not established that Gazzigli's failure to Black amounted to deficient

11  performance or prejudiced petitioner.  Black's testimony would not have demonstrated that, after

12  the robbery,the victims fabricated petitioner's use of a gun.

13          *Moore*

14          According to Nushi's declaration, Moore spoke with Moikeha after the robbery and, "[t]o

15  the best of her recollection, [Moore] did not hear Moikeha mention that the robber had a gun."

16  (ECF No. 17 at 62.)  The declaration also notes that "Moore has never previously been

17  interviewed by anyone about the robbery or the subject matter discussed in this declaration apart

18  from one phone call that she received approximately one year after the robbery."  (Id.)  Nushi's

19  declaration further notes that "Moore was apprehensive to sign a declaration."  (Id.)  Petitioner

20  did not submit a declaration from Moore.

21          Petitioner contends that Gazzigli was ineffective for failing to investigate Moore.   But

22  petitioner does not even allege that Gazzigli should have known about the existence of Moore.

23  Even if a reasonable attorney would have identified, located, and interviewed Moore, a

24  reasonable attorney would likely avoid calling a witness that refuses to sign a declaration even

25  years after petitioner's conviction.

26          In addition, as noted above, Moikeha referred to the "man with the gun" on the 911 tape.

27  For this reason, Moore's alleged testimony that Moikeha did not mention that a gun was used

28  during the robbery would not have demonstrated that, well after the robbery, the victims allegedly

1    fabricated their claim that petitioner used a gun.

2          For the reasons discussed above, the undersigned finds that  petitioner has not established

3    that Gazzigli's failure to investigate and call Moore amounted to deficient performance or

4    prejudiced petitioner.

5                    *Printy*

6          Printy saw petitioner flee the gas station holding something in his hands.  (ECF No. 17 at

7    57.)  Printy could not say whether the object was a gun, and he did not see petitioner discard

8    anything while fleeing.  (Id.)  Immediately after the robbery, Printy spoke with Linderman;

9    according to Printy, Linderman stated that she had been robbed and maced, but did not say that

10   the perpetrator had a gun.  (Id. at 47.)

11         On direct appeal, the Court of Appeal commented that it was "unclear from the record

12   what [Printy] may have seen."  Woods, 2010 WL 1805382, at *10.  In support of the state habeas

13   petition, petitioner submitted a post-conviction declaration from Printy.  Unfortunately, the

14   declaration does not clarify what Printy saw.  The declaration states that (1) Printy saw petitioner

15   holding something in his hands during the robbery, but that Printy still did not know what the

16   object was, (2) Printy did not see the petitioner drop anything while fleeing, and (3) when Printy

17   spoke to one of the victims after the robbery, she "did not say anything about the robber having a

18   gun." (ECF No.17 at 57-58.)

19         According to petitioner, Gazzigli never interviewed Printy, despite his statement being in

20   the police reports.   (Id. at 42.)  Petitioner does not indicate whether or to what extent Printy's

21   statement in the police report differs from his declaration.  More critically, petitioner has not

22   demonstrated that the police report would have prompted a reasonable attorney to contact and

23   interview Printy.  If Printy's statement in the police report is similar to Printy's declaration, a

24   reasonable attorney might not bother to seek testimony of what Printy did not see or what he

25   alleges a victim allegedly did not say.

26         In addition, Printy's statement that one of the victims did not mention the robber using the

27   gun would not have demonstrated that, well after the robbery, the victims allegedly fabricated

28   their claim that petitioner used a gun.  As noted above, in the 911 call, Moikeha referred to the

                                        28

1  "man with the gun."

2      Accordingly, petitioner has not demonstrated Gazzigli was ineffective with respect to his

3  decision to not investigate or to have Printy testify.

4          *Knickerbocker*

5      Knickerbocker, an employee of the gas station at the time of the robbery, "never heard

6  that there was a gun involved in the robbery until many months, perhaps even a year, after the

7  robbery."  (ECF No. 17 at 63.)

8      Petitioner contends that the deficiency of Gazzigli's investigation is evidenced by the fact

9  that Gazzigli "never interviewed or even mentioned" Knickerbocker.  (Id. at 43.)  But Nushi's

10 declaration provides a reasonable explanation for why Gazzigli never interviewed Knickerbocker:

11 even years after petitioner's conviction, Knickerbocker "was reluctant to become involved in this

12 case in any manner."  (Id. at 63.)   There is simply no reason why Gazzigli would have

13 interviewed an employee of the gas station that was not present at the time of the robbery.

14 Moreover, Knickerbocker's observation, like that of the other witnesses petitioner emphasizes

15 should have been interviewed and called to testified, is hardly probative.  As noted above,

16 Moikeha told Black on the night of the robbery that Linderman told Moikeha that petitioner had

17 used a gun.

18     The fact that Knickerbocker did not hear about petitioner's use of a gun until months after

19 the robbery does not demonstrate that the victims fabricated their claim that petitioner used a gun.

20 As noted above, Moikeha's reference in the 911 call to the "man with the gun" undermines this

21 claim.  Accordingly, petitioner has not established that Gazzigli's failure to investigate and call

22 Knickerbocker amounted to deficient performance or prejudiced petitioner.

23          c.  **Conclusion on Gazzigli's failure to investigate and call
              witnesses**

24

25     Petitioner cannot show that Gazzigli's failure to present the proposed evidence deprived

26 petitioner of his Sixth Amendment right to counsel.  The Ninth Circuit "has repeatedly held that

27 '[a] lawyer who fails adequately to investigate and introduce . . . [evidence] that demonstrate[s]

28 his client's factual innocence, or that raise[s] sufficient doubt as to that question to undermine

1    confidence in the verdict, renders deficient performance.'" <u>Duncan v. Ornoski</u>, 528 F.3d 1222,

2    1234 (9th Cir. 2008) (quoting <u>Hart v. Gomez</u>, 174 F.3d 1067, 1070 (9th Cir. 1999)).  But, the

3    proposed testimony of Black, Moore, Printy, and Knickerbocker, even cumulatively, does not

4    demonstrate that petitioner did not use a gun when committing the robbery or raise a sufficient

5    doubt to undermine confidence in the verdict.  Accordingly, habeas relief under § 2254 is not

6    warranted.

7                    **3.  Counsel's decision to not introduce petitioner's backpack**

8                              **a.  Background**

9         In a declaration submitted in petitioner's state habeas action in Siskiyou County Superior

10   Court, Gazzigli's explains that petitioner initially and subsequently told Gazzigli that he did not

11   own a .25 caliber Berretta.  (ECF No. 17-5 at 4.)  However, it turned out that petitioner did have a

12   .25 caliber Berretta that he claimed he lost on a camping trip.  (<u>Id.</u>)  Petitioner provided Gazzigli

13   with the name of a witness, Mr. Vickery.  (<u>Id.</u>)  Vickery testified that he was told by petitioner hat

14   he had lost the gun while on the camping trip with Vickery.  (<u>Id.</u>)  It was Gazzigli's recollection

15   that Vickery testified that he did not see the gun and that they did not go back to their campsite to

16   retrieve the gun.  (<u>Id.</u>)  Not wanting to suborn perjury, Gazzigli reported this ethical dilemma to

17   the judge and district attorney, but the judge denied Gazzigli's motion to be relieved.  (<u>Id.</u>)

18        Gazzigli explains that Linderman described a gun identical to the one petitioner's wife

19   gave petitioner but allegedly lost.  (<u>Id.</u> at 7.)  Gazzigli "therefore felt that any further

20   []examination of [petitioner] along these lines would have been untrue and subornation of

21   perjury" and did not introduce into evidence the backpack form which petitioner claims to have

22   lost the gun.  (<u>Id.</u>)

23        Petitioner challenged Gazzigli's response to the perceived perjury in his habeas petitions

24   but not on direct appeal.  Because the state courts summarily denied the habeas petition, petitioner

25   must prove there was no reasonable basis to deny relief.  <u>Richter</u>, 131 S. Ct. at 784.

26                              **b.  Analysis**

27        In <u>Nix v. Whiteside</u>, 475 U.S. at 157, 166 (1986), the United States Supreme Court

28   addressed what constitutes "'reasonable professional' responses to a criminal defendant client

                                          30

1    who informs counsel that he will perjure himself on the stand."  First among the reasonable

2    responses is "attempt[ing] to dissuade the client from the unlawful course of conduct."  Id. at 169.

3    This attempt may include the threat to withdraw from representation if the client persists in the

4    desire to commit perjury.  Id. at 171.  Counsel may also move to withdraw from representation

5    prior to the start of trial.  Id. at 170.  When counsel learns of proposed perjury during trial,

6    counsel has the option of allowing his client to take the stand and to testify in narrative fashion,

7    unaided by counsel.  Id. at 170 n.6.  Finally, "an attorney's revelation of his client's perjury to the

8    court is a professionally responsible and acceptable response to the conduct of a client who has

9    actually given perjured testimony."  Id. at 170.

10       Petitioner contends that Gazzigli's decision to not introduce the backpack from which

11   petitioner claimed to have lost the gun while camping was not a reasonable professional response

12   under Nix.  But this is not a Nix issue; rather, petitioner is simply challenging Gazzigli's decision

13   to not introduce an item of evidence.  Gazzigli explained the decision in his declaration:  "[F]or

14   us to produce the backpack at that time . . . would be nothing more than confusing and would

15   only draw additional attention to [petioner's] previous and obvious prevarications and thus would

16   further inflame the jury."  (Gazzigli Decl. at 6.)  Trial counsel is not constitutionally obligated to

17   present available evidence when, in the trial counsel's view, the witness or evidence may

18   ultimately prove to be unhelpful or even detrimental to his client's defense.  See Lord, 184 F.3d at

19   1095.  Where counsel has made an informed, strategic decision against proffering testimony or

20   evidence, that decision cannot be second-guessed on habeas review.  See Strickland, 466 U.S. at

21   690.  Because petitioner has not established that there was no reasonable basis for the state courts

22   to deny relief on this argument, this court cannot grant habeas relief.

23          **4. Counsel's failure to subpoena a witness after promising the jury to**
24              **present her testimony**

25              **a. Background**

26   The Court of Appeal summarized and analyzed petitioner's argument:

27   Defendant complains that Attorney Gazzigli failed to present the testimony of
     Karen E., a nurse practitioner. During the Marsden hearing, Attorney Gazzigli
28

31

1   explained that he attempted numerous times to locate and to speak with Karen but
2   was unsuccessful because he could not locate her. Attorney Gazzigli learned that
    Karen did not want to discuss the case with him and did not want to help
3   defendant. Attorney Gazzigli noted that he tried to get Karen's report into
    evidence, that the court ruled it was inadmissible, but that the contents came in
4   through Dr. Andrews's and defendant's testimony. Although Attorney Gazzigli
5   told the jurors in opening statement that they would hear from Karen that
    defendant complained about pain and the prescriptions given to him for the pain,
6   defendant testified to the same and Dr. Andrews did as well. The jury was
7   instructed that neither side was required to call all witnesses. Karen's possible
    testimony is not part of the record on appeal. Again, defendant has failed to
8   demonstrate on this record that Attorney Gazzigli's performance was deficient in
9   this respect.

10
11  Woods, 2010 WL 1805382, at *10.

12              **b. Analysis**

13          Petitioner's habeas petitions restate his argument that Gazzigli's failure to subpoena Karen

14  Edwards after promising her testimony to the jury in his opening statement amounted to

15  ineffective assistance of counsel.  In support of his claim, petitioner cites to Williams v.

16  Woodford, 859 F. Supp. 2d 1154 (E.D. Cal. 2012), and Saesee v. McDonald, 725 F.3d 1045 (9th

17  Cir. 2013).  Though relevant, those decisions actually corroborate the state court's rejection of

18  petitioner's claim.  In Williams, trial counsel promised the jury—but failed to present—the

19  testimony of both the defendant an alibi witness.  859 F. Supp. 2d at 1171.  Chief Judge Kozinski

20  observed that "[a] number of circuits have held, in similar circumstances, that a lawyer's

21  unfulfilled promise of key testimony qualifies as deficient performance under Strickland."  Id. at

22  1170 (emphasis added).  Moreover in Saesee, the Ninth Circuit explained that "no clearly

23  established federal law required the California Court of Appeal to presume prejudice for a broken

24  promise or to assign the alleged broken promise any particular prejudicial weight."  725 F.3d at

25  1050.

26          The Court of Appeal's rejection of petitioner's argument was not contrary to, or an

27  unreasonable application of, clearly established federal law.  The Court of Appeal explicitly

28  found that Gazzigli's performance was not inadequate, and the Court's rationale suggests

                                        32

1  petitioner was not prejudiced by Gazzigli's failure to call Edwards.  As noted above, the Court of

2  Appeal found that the contents of Edwards' report, petitioner's complaints of pain, and

3  petitioner's pain prescriptions still "came in through Dr. Andrews's and defendant's testimony."

4  Woods, 2010 WL 1805382, at *10.  Additionally, the trial court judge instructed the jury that

5  neither petitioner nor the prosecution was required to call all witnesses.  Id.  Even if Edwards'

6  testimony was "key"(the Court of Appeal opinion and this court's review of the record suggests

7  otherwise), and Gazzigli's unfulfilled promise to present it amounted to deficient performance,

8  petitioner fails to demonstrate that every fairminded jurist would have found prejudice.

9  Therefore, petitioner's claim fails to satisfy § 2254(d).

10  **5. Failure to request a jury instruction on involuntary intoxication**

11  Petitioner contends that Gazzigli's failure to request a jury instruction on involuntary

12  intoxication amounted to inadequate assistance of counsel because there was evidence in the

13  record supporting the instruction.  Petitioner argues that counsel was ineffective during closing

14  argument for conceding petitioner's guilt of using tear gas because petitioner's involuntary

15  intoxication was a defense to this offense.

16  Petitioner raised this claim in his direct appeal and the California Court of Appeal rejected

17  both petitioner's premise and conclusion.  The Court found that "there was no substantial

18  evidence to support an instruction on involuntary intoxication, that is, defendant unknowingly

19  ingested medication or alcohol or his intoxication was caused by the force of someone else . . . ."

20  Woods, 2010 WL 1805382, at *10.

21  The undersigned agrees with the California Court of Appeal that the record did not

22  support an instruction for involuntary intoxication.  There was no substantial evidence that

23  petitioner unknowingly ingested medication or alcohol or that someone forced him to become

24  intoxicated.[5]

25  [5]  "A person whose intoxication is not voluntary is relieved from liability because of excusable
26  mistake.  'What prevents the intoxication from being voluntary in these cases of fraud is not the
   trickery of the other person but the innocent mistake of fact by the one made drunk, and an actual
27  ignorance of the intoxicating character of the liquor or drug has the same effect whether the
   mistake is induced by the artifice of another or not.' [Citation.]"  People v. Chaffey, 25
28  Cal.App.4th 852, 856 (1994).

1   Because it is not likely that the outcome of the trial would have been different had the jury

2   received an instruction for involuntary intoxication, this claim of ineffective assistance of counsel

3   is without merit.

4       It is difficult to fault Gazzigli for conceding petitioner's use of tear gas.  Given that both

5   victims testified to that fact, Gazzigli was wise to focus his efforts elsewhere.  See Richter, 131 S.

6   Ct. at 790 ("There is a 'strong presumption' that counsel's attention to certain issues to the

7   exclusion of others reflects trial tactics rather than 'sheer neglect.'").  Given the evidence

8   indicating that petitioner used tear gas, Gazzigli's concession could not have prejudiced

9   petitioner.  Accordingly, this court cannot grant petitioner's habeas petition on the grounds that

10  Gazzigli conceded petitioner's use of tear gas.

11              **6.  Counsel's "cumulative deficient performance"**

12                          **a.  Background**

13      Without citing any authority, petitioner argues that Gazzigli rendered a "cumulative[ly]

14  deficient performance."  (ECF No. 17 at 50.)  In addition to the aforementioned errors, petitioner

15  contends that trial counsel "sat down nearly the entire trial" and "belittled petitioner in open

16  court, conceded evidence, failed to object, ignored petitioner's questions, and consumed alcohol."

17  (Id. at 50-51.)  According to petitioner, "[s]uch behavior prejudices petitioner's appearance to the

18  jury and lowers counsel's professional appearance, a valuable asset in a criminal defense case."

19  (Id. at 50.)

20      Petitioner raised this argument in his state habeas petition but not on direct appeal of his

21  conviction.  Thus, this court must review the state court record to determine whether there was

22  any "reasonable basis for the state court to deny relief."  Richter, 131 S. Ct. at 784.

23                          **b.  Analysis**

24      Petitioner does not provide authority for his "cumulative deficient performance" argument

25  because there is none.  Presumably, petitioner's theory is based on a misreading of Ninth Circuit

26  precedent that permits courts to aggregate prejudice—an element distinct from deficient

27  performance under Strickland—when there is at least one "error of constitutional magnitude."

28  Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of

1   constitutional magnitude occurred, no cumulative prejudice is possible.") (citation omitted);

2   Mancuso v. Olivarez, 292 F.3d 939, 957 (2002) ("Because there is no single constitutional error

3   in this case, there is nothing to accumulate to a level of a constitutional violation."); see also

4   Galloway v. Adams, 2007 WL 295552, at *13 n.11 (N.D. Cal. Jan. 30, 2007) (declining to

5   consider whether prejudice resulted from "the cumulative impact of deficiencies" when habeas

6   petitioner failed to demonstrate counsel was deficient in the first instance), aff'd, 316 Fed. Appx.

7   530 (9th Cir. 2008).  Moreover, simply alleging multiple errors does not obviate the need to

8   establish prejudice; rather, it obviates the need to find prejudice from any one error.  See Mak v.

9   Blodgett, 970 F.2d 614, 622 (9th Cir. 1992).  The fact that several errors are identified does not

10  by itself show cumulative prejudice.  See Yates v. Small, 357 Fed. Appx. 40, 42 (9th Cir. 2009)

11  (observing that the claimed errors by trial counsel "were not prejudicial individually or

12  cumulatively").

13       Similar to Hayes and Mancuso, here petitioner has failed to establish an error of

14  constitutional magnitude.  There is simply no authority supporting petitioner's suggestion that

15  sitting down for most of the trial, belittling petitioner in open court, conceding evidence, failing to

16  object to evidence, ignoring petitioner's questions, and consuming alcohol, individually amount

17  to deficient performance; unsurprisingly, petitioner does not even attempt to argue such.  Thus,

18  because there is no "cumulative deficient performance" doctrine and because petitioner has still

19  not established any error amounting to deficient performance under Strickland, the state court's

20  decision was no contrary to or an unreasonable application of clearly established federal law or

21  based on an unreasonable determination of the facts.

22                              **CONCLUSION**

23       The standard for federal court review of a state court decision under § 2254(d) is a highly

24  deferential one.  After considering application of this standard to petitioner's claims, this court

25  concludes that petitioner has failed to satisfy § 2254(d).

26       Accordingly, IT IS HEREBY ORDERED that the Clerk of the Court shall appoint a

27  district judge to this action; and

28  ////

                                        35

1    IT IS HEREBY RECOMMENDED that the petition be denied.

2    These findings and recommendations are submitted to the United States District Judge

3  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within sixty days after

4  being served with these findings and recommendations, any party may file written objections with

5  the court and serve a copy on all parties.  Such a document should be captioned "Objections to

6  Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file

7  objections within the specified time may waive the right to appeal the District Court's order.

8  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9  Dated:  July 24, 2014

10

11  woods1368.157

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

36